# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | No. 17-cr-797 |
| v. ) | |
| ) | Judge Robert M. Dow, Jr. |
| JERMOL MIXON ) | |
| ) | |

## MEMORANDUM OPINION AND ORDER

For the reasons set forth below, Defendant Jermol Mixon's motion to suppress [65] is denied. On the Court's own motion the status hearing set for May 20, 2019 at 10:00 a.m. is reset to 1:30 p.m. This is a time change only.

## I. Background

Defendant Jermol Mixon is charged with possession of a controlled substance with intent to distribute, in violation of 21 U.S.C. 841(a)(1), felon in possession of a firearm, in violation of 18 U.S.C. 922(g)(1), and possession of a firearm in furtherance of a drug trafficking crime, in violation of 18 U.S.C. 924(c)(1)(A). On December 12, 2017, at 11:00 p.m., Magistrate Judge Kim issued a search warrant at 16143 Hackney Drive in Orland Park (the "Subject Premises") authorizing the seizure of narcotics, residency documents, paraphernalia, money, firearms, and records, among other things. [65-1.] The search warrant was supported by an application and affidavit submitted by Homeland Security Investigations Special Agent Mark Wasunyk. [65-3.]

Defendant has moved to suppress evidence recovered from the search conducted on December 12, 2017, arguing that (1) the application and affidavit submitted by Agent Wasunyk were not sufficient to establish probable cause and (2) the good-faith exception does not apply. According to the affidavit submitted by Agent Wasunyk, the Government had been investigating allegations that a group in Chicago had been importing fentanyl and fentanyl analogues from China

and Hong Kong into Chicago. [65-3, at ¶ 9.] As set out in detail below, certain evidence indicated that Sanchez Lackland and Timothy Gonzalez-Umstead were involved in this illegal conduct. [*Id.*]

### A. Packages

The Affidavit outlined evidence connecting packages containing known or suspected illegal substances to Lackland and Gonzalez-Umstead. On or about February 27, 2017, law enforcement intercepted a package from Hong Kong that was addressed to Timothy Umstead at 9201 S. Eberhart, Chicago, Illinois. [*Id.* at ¶ 11.] A field test of the package indicated that it contained approximately 1,072 grams of a substance presumptively containing acryl fentanyl. [*Id.*] Records of the U.S. Customs and Border Protection indicated that three other packages were sent from China to Timothy Gonzalez at that same residence. [*Id.* at ¶ 12.] These three packages were not seized or submitted for further inspection, but they were declared to have contained "silica gel desiccant" or "potassium formate." [*Id.*] Based on his investigation and his experience, Agent Wasunyk averred that he believed the packages contained controlled substances. [*Id.* at ¶ 13.]

The government also inspected a package found to have substances presumptively identified as controlled substances that was sent from Hong Kong to an address in Markham, Illinois that, according to Secretary of State records, Lackland previously had listed on his driver's license. [*Id.* at ¶ 14.] According to United States Postal Service records, someone was tracking this package on numerous occasions in November and December 2017. [*Id.* at ¶ 15.] The account associated with the IP address tracking the packages listed Sanchez Lackland as the subscriber. [*Id.*] The address was listed as 18024 Kedzie Avenue, Apartment 202, Hazel Crest, Illinois (the "Lackland Residence"). [*Id.*] Someone using the IP address associated with the Lackland Residence also tracked other packages that contained or were suspected to contain controlled substances. [*Id.* at ¶¶ 16-19.] Based on his training, experience, and familiarity with the case,

2

Agent Wasunyk stated his belief that the individual tracking the progress of the packages knew the packages contained fentanyl or a fentanyl analogue and intended to participate in its manufacture and distribution in some manner. [*Id*. at ¶ 18.]

    **B.    Other Evidence Regarding Lackland and Gonzalez-Umstead**

The Affidavit also outlined other evidence indicating that Lackland and Gonzalez-Umstead were involved in the distribution of controlled substances. Gonzalez-Umstead had ordered a pill press around the same time that law enforcement seized about one kilogram of a fentanyl analogue addressed to him. [*Id*. at ¶ 20.] There also was evidence that Gonzalez-Umstead purchased $20,000 in Bitcoin. [*Id*.] Agent Wasunyk testified that based on his training and experience, he believed that Gonzalez-Umstead purchased $20,000 worth of Bitcoin to pay for the narcotics being shipped in the packages. [*Id*.]

According to records from the Illinois Secretary of State, Lackland and Gonzalez-Umstead also are the registered managers of an entity named Certified Realtor Group LLC.[1] [*Id*. at ¶ 21.] Phones associated with Lackland and Gonzalez-Umstead were in contact approximately 37 times between December 1, 2017 and December 7, 2017, around the same time packages found to contain controlled substances were being tracked by someone at the Lackland Residence. [*Id*. at ¶ 22.] Agent Wasunyk testified that, based on his training, experience, and familiarity with the case, he believed that Lackland and Gonzalez-Umstead had discussions regarding the possession, manufacture, or distribution of controlled substances during these calls. [*Id*. at ¶ 23.] The Affidavit outlined other circumstantial evidence connecting Lackland and Gonzalez-Umstead to the illegal trafficking of controlled substances.

---

[1] The Affidavit indicates that Defendant also is listed as a manager of this LLC. [*Id*. at ¶ 42.]

### C. Search of the Lackland Residence

On December 12, 2017, agents executed a search warrant on the Lackland Residence. [*Id*. at ¶ 40.] In the main bedroom, agents observed a closet that was half full of men's clothing and half full of women's clothing. [*Id*.] On the side of the closet with men's clothing, agents found a firearm, approximately one kilogram of what was thought to be heroin, approximately one kilogram of what was thought to be fentanyl (or a fentanyl analogue), and more than $100,000 cash. [*Id*.] Agents also found evidence that Lackland lived at the residence, including his wallet and mail addressed to him. [*Id*.]

### D. Delivery of Cooler to Subject Premises

On or about December 12, 2017 at approximately 1:17 p.m., agents observed a white Jaguar Sports Utility Vehicle (the "Vehicle") arrive at the Lackland Residence. [*Id*. at ¶ 29.] Agents observed Lackland exit the Vehicle (which was being driven by Gonzalez-Umstead) with what the Affidavit identified as a duffel bag [*id*.], but was determined to be a soft cooler. (As discussed in greater detail below, the Court requested, and the parties have provided, photographs [80, 82] of the item in question.) Based on the appearance of the bag, agents claim that they were able to see that it was not filled when Lackland entered the Lackland Residence. [65-3, at ¶ 29.] A few minutes later, agents observed Lackland exit the residence and enter the Vehicle carrying the same bag. [*Id*.] According to agents, the bag appeared heavier, requiring more effort on the part of Lackland to carry. [*Id*.]

At about 1:23 p.m., the Vehicle departed the Lackland Residence and traveled to a location where a package of narcotics was scheduled to be delivered. [*Id*. at ¶ 31.] Lackland exited the Vehicle to obtain a note that had been left at that location regarding the package of narcotics. [*Id*.] After Lackland got back in the Vehicle, the Vehicle stopped at Lifetime Fitness and then was

observed by making several U-turns. [*Id*. at ¶ 32.] Based on his training and experience, Agent Wasunyk believed that Lackland and Gonzalez-Umstead were conducting counter-surveillance measures to avoid detection by law enforcement because they were trafficking narcotics at the time. [*Id*.]

At approximately 2:18 p.m., agents observed the Vehicle arrive at the Subject Premises. [*Id*. at ¶ 33.] Agents observed Lackland and Gonzalez-Umstead exit the Vehicle. [*Id*.] Gonzalez-Umstead now was carrying the bag. [*Id*.] Approximately ten minutes later, agents observed both men leave the Subject Premises, but neither man had the bag. [*Id*.] Based on his training, experience, and familiarity with the case, Agent Wasunyk represented that he believed that Lackland and Gonzalez-Umstead delivered a controlled substance to the Subject Premises. [*Id*. at ¶ 34.]

After departing from Gonzalez-Umstead, agents observed Lackland drive to a residence where a package that the Government had equipped with a tracking device and trigger had been delivered earlier that day. [*Id*. at ¶ 39.] Before delivering the package, U.S. Customs and Border Protection conducted a field test of its contents, which presumptively identified the white, powder-like substance inside the package as a fentanyl analogue. [*Id*. at ¶ 16.] At approximately 3:32 p.m., agents observed Lackland enter the residence. [*Id*. at ¶ 39.] Shortly after, Lackland exited the residence carrying the package and entered a Silver Camaro. [*Id*.] After agents received a signal that the package had been opened, agents stopped the Silver Camaro and found the package hidden under the driver's seat. [*Id*.] Lackland was then arrested. [*Id*.]

## II. Legal Standard

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. CONST. amend. IV.

With few exceptions, the Fourth Amendment generally requires that the issuance of a warrant supported by probable cause precede any search. *Stanley v. Henson*, 337 F.3d 961, 963 (7th Cir. 2003). Probable cause to search "is established when, considering the totality of the circumstances, there is sufficient evidence to cause a reasonably prudent person to believe that a search will uncover evidence of a crime." *United States v. Sutton*, 742 F.3d 770, 773 (7th Cir.2014) (citing *Illinois v. Gates*, 462 U.S. 213, 238 (1983)).

"When a search is authorized by a warrant, deference is owed to the issuing judge's conclusion that there is probable cause." *United States v. Carroll*, 750 F.3d 700, 703-04 (7th Cir. 2014) (quoting *United States v. Sutton,* 742 F.3d 770, 773 (7th Cir. 2014)) (internal quotation marks omitted). "[I]ssuing judges may draw reasonable inferences about where evidence is likely to be found based on the nature of the evidence and the offense." *Id*. (citations omitted). "Courts should defer to the issuing judge's initial probable cause finding if there is substantial evidence in the record that supports his decision." *Id.* (citation omitted). Thus, "[a] district court does not engage in de novo review of an issuing judge's conclusion that, based on the totality of the circumstances, there was a 'fair probability that contraband or evidence of a crime w[ould] be found in a particular place.'" *United States v. Kelly*, 772 F.3d 1072, 1080 (7th Cir. 2014) (quoting *Illinois v. Gates*, 462 U.S. 213, 238 (1983)). "Rather, in reviewing the issuing judge's probable cause determination, the district court need only evaluate whether the judge had a 'substantial basis' for concluding that probable cause existed." *Id*. (citation omitted).

## III. Analysis

### A. Probable Cause

Defendant moves to suppress evidence seized in connection with the warrant executed on the Subject Premises because—according to Defendant—the warrant was not supported by

probable cause. Specifically, Defendant argues that the government failed to present accurate evidence connecting the Subject Premises to illegal conduct. The Seventh Circuit "has consistently held that, for a search warrant, probable cause 'does not require direct evidence linking a crime to a particular place.'" *United States v. Zamudio*, 909 F.3d 172, 175 (7th Cir. 2018) (quoting *United States v. Anderson*, 450 F.3d 294, 303 (7th Cir. 2006)). "Rather, issuing judges may draw reasonable inferences about where evidence is likely to be found based on the nature of the evidence and the offense." *Id*. (citing *United States v. Orozco*, 576 F.3d 745, 749 (7th Cir. 2009); *United States v. Lamon*, 930 F.2d 1183, 1188 (7th Cir. 1991)). "Thus, an affidavit submitted in support of a warrant application 'need only contain facts that, given the nature of the evidence sought and the crime alleged, allow for a reasonable inference that there is a fair probability that evidence will be found in a particular place.'" *Id*. (quoting *United States v. Aljabari*, 626 F.3d 940, 944 (7th Cir. 2010)). Based on the evidence presented in the Affidavit and the reasonable inferences drawn from it, the Court concludes that Magistrate Judge Kim had a substantial basis for concluding that probable cause existed.

To begin, the Affidavit outlined in detail evidence showing that someone at the Lackland Residence was involved in the distribution of controlled substances. The Affidavit cited evidence showing that someone using a device within the Lackland Residence was closely tracking the progress of numerous packages containing or suspected to contain fentanyl or fentanyl analogues. [65-3, at ¶¶ 14-19.] Based on his training, experience, and familiarity with the case, Agent Wasunyk communicated his belief that the individual closely tracking these packages knew the packages contained drugs and intended to participate in some manner in the manufacture and distribution of the drugs. [*Id*. at ¶ 18.]

7

The Affidavit further outlined in detail evidence linking Lackland and Gonzalez-Umstead to the importation and distribution of fentanyl and fentanyl analogues. As discussed above, the Affidavit outlined evidence indicating that Lackland and Gonzalez-Umstead were involved in tracking and recovering of packages that contained or were suspected to contain fentanyl and fentanyl analogues. There was evidence indicating that Gonzalez-Umstead had ordered a pill press around the same time that law enforcement seized about one kilogram of a fentanyl analogue addressed to him. [*Id*. at ¶ 20.] There also was evidence that Gonzalez-Umstead purchased $20,000 in Bitcoin. [*Id*.] Agent Wasunyk testified that based on his training and experience, he believed that Gonzalez-Umstead purchased $20,000 worth of Bitcoin to use to buy the narcotics being shipped in the packages being tracked. [*Id*.] Furthermore, a search of the Lackland Residence conducted pursuant to a warrant recovered a firearm, approximately one kilogram of what was thought to be heroin, approximately one kilogram of what was thought to be fentanyl (or a fentanyl analogue), and more than $100,000 cash. [*Id*. at ¶ 40.] Although these items were recovered from a closet containing both men's clothing and women's clothing (indicating that the closet was shared), they were recovered from the side of the closet containing men's clothes. [*Id*.] Agents also found evidence that Lackland lived at the residence, including his wallet and mail addressed to him. [*Id*.]

Finally, the Affidavit outlines evidence that Lackland filled a bag at his residence and that he and Gonzalez-Umstead delivered the bag to the Subject Premises. Defendant challenges both the factual accuracy of representations relating to this evidence, as well as the import of this evidence. As to the factual accuracy, Defendant argues that "[t]he unqualified representation in the Affidavit that agents saw the bag being filled inside of Lackland's apartment was false." [69, at 2.] According to Defendant, the fact "[t]hat the [A]ffidavit later contained the observations

8

made by the agents does not make the earlier statement true." [*Id*.] The Court disagrees. The Affidavit represents that Lackland and Gonzales-Umstead "were observed * * * filling a bag at a residence where suspected heroin, suspected fentanyl (or a fentanyl analogue), large amounts of cash, and a firearm were later seized[.]" [65-3, at ¶ 9.] Although this paragraph does not expressly state whether agents actually witnessed the filling of the bag, the Court does not find the representation misleading. To begin, it is unlikely that drug traffickers would fill a bag with drugs in plain view of others. Furthermore, if agents actually witnessed the filling of the bag, common sense would dictate that the agents would describe who filled the bag and with what the bag was filled. There also is an entire section of the Affidavit discussing the delivery of the bag. This portion of the Affidavit is central to the Government's case for probable cause. The Court has no reason to believe that Judge Kim did not read this portion of the Affidavit, which provides the factual support for the conclusion that the bag was filled in the Lackland Residence. By observing Lackland carry a bag into and back out of the residence shortly thereafter, it was not unreasonable for the agents to conclude that the bag was filled in the residence.

Defendant further argues that the Affidavit misrepresents facts because the bag delivered to the Subject Premises was a "soft cooler" and not a "duffle bag" as represented in the Affidavit.[2] Defendant further argues that agents lied about the bag being heavier and requiring more effort by Lackland to carry after he left the residence, noting that it would not have required much effort to carry a soft cooler even if it were filled with drugs. Because the persuasiveness of that argument might depend on the size and appearance of the bag, the Court asked the parties to provide more

---

[2] Defendant's initial brief also indicates that there is a dispute about whether agents observed a man deliver garbage bags to the Subject Premises. It is Defendant's position that agents would not have been able to see the bags being unloaded. However, Defendant conceded at oral argument that the issue was not material, and the Court agrees.

9

information about the item in question. The parties provided numerous images of the item, including an image of Lackland carrying it. The parties now agree that the item was a soft cooler.

"[E]vidence recovered from a search must be suppressed if a defendant proves by a preponderance of the evidence that: (1) the affidavit contained material false statements or omissions; (2) these false statements or omissions were made with deliberate or reckless disregard for the truth; and (3) these false statements or omissions were necessary to a finding of probable cause." *United States v. Gregory*, 795 F.3d 735, 743 (7th Cir. 2015) (citations omitted). The Court concludes that the "false" statement (i.e., that the item in question was a duffle bag instead of a soft cooler) was not made with deliberate or reckless disregard for the truth. Agents were not able to closely examine the bag until after the search warrant was executed. Given the appearance of the bag and the way that Lackland was carrying the bag in the picture provided to the Court, the Court understands how the item could have been mistaken for a duffle bag. The cooler is ten inches in height, thirteen inches in length, and seven inches in depth. Drawing on everyday experience, the Court surmises that those measurements are slightly smaller than most duffle bags, but larger than the type of soft cooler in which one might carry a lunch to work. Agents were not able to measure the item until after it was recovered. From a distance, the Court understands how officers could mistake a bag with these dimensions as a duffle bag. In any event, the "false" statement—that Lackland was carrying a "duffle bag" as opposed to another type of bag of similar size—is not material. *United States v. Richards*, 209 F. App'x 561, 564 (7th Cir. 2006) (affirming denial of motion to suppress where factual errors were not "necessary to the district court's finding of probable cause"); see also *United States v. Carmel*, 548 F.3d 571, 577 (7th Cir. 2008) ("[I]f probable cause to issue the warrant would still exist even if the false statement or material omission

were corrected," then Defendant is not entitled to a hearing to determine whether the evidence should be suppressed.).

Given the size of the bag, however, the Court cannot place much weight on the agents' assertion that the bag looked heavier and required more effort on the part of Lackland to carry after he left the residence. That assertion is the least persuasive aspect of the Government's presentation. True, the cooler was not recovered immediately after it was delivered to the Subject Premises, and therefore it is possible that some of the contents were removed before agents seized it partially full. But even completely filled, a cooler of that size could have been carried without too much effort by an adult. If the agents' representations about the heft of the bag were critical to the narrative as a whole, this would be a closer case for suppression. But given the distance at which they were viewing the events and the strength of the other indicia of narcotics trafficking, the likely exaggeration is less important.

Defendant also argues that the Affidavit inaccurately states that Gonzalez-Umstead was in contact with a phone registered to Defendant. [65-3, at 23.] According to Defendant, the phone was a prepaid cellular phone that was not registered in Defendant's name. In response, the Government explains that agents determined that the phone belonged to Defendant by querying the relevant phone number in a law enforcement database. [68, at 10.] The Court agrees that the Affidavit should have better explained how law enforcement determined that the phone was associated with Defendant, although Defendant's argument presents a double-edged sword, for narcotics dealers often use unregistered phones to evade detection of their illegal enterprises. However, the Court does not find this debate very significant either—whether or not Defendant

11

was in phone contact with Gonzalez-Umstead is of little, if any, import to the probable cause analysis.[3]

Finally, Defendant argues that the Affidavit as a whole fails to establish probable cause. Defendant submits that one observed visit to a home over the course of a ten-month investigation is not enough to establish probable cause. The Court recognizes that the facts in the Affidavit do not present an open-and-shut case. The fact that a presumed drug dealer visits a residence does not alone establish probable cause to search the residence. Still, the Affidavit presents facts indicating that Lackland and Gonzalez-Umstead were engaged in illicit conduct at the time they delivered the bag to the Subject Premises. To begin, the fact that two presumed drug dealers were delivering a package together suggests that the delivery was drug related. Next, the fact that the Vehicle departed the Lackland Residence and traveled to a location where a package of fentanyl analogue was scheduled to be delivered further supports the conclusion that the two presumed drug dealers were engaged in illegal activity relating to the distribution of illegal substances at the time of the delivery to the Subject Premises. Finally, and most compellingly, the counter-surveillance measures in which the agents observed Lackland and Gonzalez-Umstead engaging strongly supported the conclusion that the delivery was related to illegal conduct. *United States v. Richards*, 719 F.3d 746, 756 (7th Cir. 2013) (finding "circuitous approach" of vehicle to support probable cause);*United States v. Garza-Hernandez*, 623 F.2d 496, 499 (7th Cir. 1980) (finding "[t]he constant use of circuitous driving by all parties to the transportation of the heroin is the single most important factor" for finding probable cause); *United States v. Carrillo*, 269 F.3d 761, 767 (7th Cir. 2001) ("[A]gents twice observed that the red Tacoma was being driven circuitously in an

---

[3] The fact showed that someone associated with the Subject Premises was communicating with Gonzalez-Umstead on the date of the delivery. However, the Affidavit also represented that Nia Tetter, who also was associated with the Subject Premises, also was in communication with Gonzalez-Umstead.

apparent attempt to evade surveillance, and our cases have held that this is a proper consideration in determining whether probable cause exists." (citations omitted)). "[W]hen observing activity of a person suspected of criminal activity, Government agents are entitled to reasonably rely upon their special knowledge and expertise to assess probabilities and draw inferences." *United States v. Marin*, 761 F.2d 426, 432 (7th Cir. 1985) (citations omitted). Putting together what he knew, what he observed, and his extensive training and experience, Agent Wasunyk believed that Lackland and Gonzalez-Umstead were conducting counter-surveillance measures to avoid detection by law enforcement because they were trafficking narcotics at the time.

Defendant argues that in order for probable cause to exist, the Government had to present evidence showing that it was more likely than not that the bag in question contained contraband. [65, at 5.] However, as the Seventh Circuit has explained, "[p]robable cause * * * does not require evidence sufficient to support a conviction, nor even evidence demonstrating that it is more likely than not that the suspect committed a crime. So long as the totality of the circumstances, viewed in a common sense manner, reveals a probability or substantial chance of criminal activity on the suspect's part, probable cause exists." *United States v. Angle*, 234 F.3d 326, 335 (7th Cir. 2000) (quoting *United States v. Sawyer*, 224 F.3d 675, 679 (7th Cir. 2000)) (internal quotation marks omitted). Furthermore, "issuing judges may draw reasonable inferences about where evidence is likely to be found based on the nature of the evidence and the offense." *Carroll*, 750 F.3d at 703-04. Looking at the totality of the circumstances, the Court concludes that substantial evidence supported Judge Kim's finding of probable cause. The Court therefore denies Defendant's motion to suppress for lack of probable cause.

### B. Good Faith

In any event, even if the Affidavit were not enough to support a finding of probable cause, Defendant has not met his burden of establishing that the good-faith exception does not apply. Under the good-faith exception, "evidence obtained in violation of the Fourth Amendment is nevertheless admissible if the officers conducting the unlawful search relied in good faith on a search warrant." *Edmond v. United States*, 899 F.3d 446, 451-52 (7th Cir. 2018) (citing *United States v. Leon*, 468 U.S. 897, 918-23 (1984)). "Because the receipt of a warrant constitutes prima facie evidence of good faith, [Defendant has] the burden to show that the exception should not apply." *Id*. (citing *United States v. Pappas*, 592 F.3d 799, 802 (7th Cir. 2010)). "A defendant can rebut the presumption of good faith only by showing that the judge issuing the warrant abandoned his/her detached and neutral role, the officers were dishonest or reckless in preparing the affidavit, or the warrant was so lacking in probable cause as to render the officer's belief in its existence entirely unreasonable." *United States v. Otero*, 495 F.3d 393, 398 (7th Cir. 2007) (citation omitted).

Defendant argues that the good-faith exception should not apply in this case for all three reasons. The Court disagrees. Other than to assert that the magistrate judge rubber-stamped the warrant, Defendant has not identified any facts indicating that the issuing judge abandoned his detached and neutral role.[4] Although Defendant argues that the agents dishonestly and recklessly prepared the Affidavit supporting probable cause, the Court does not find that argument persuasive

---

[4] In his initial motion, Defendant implies that the magistrate judge acted improperly by issuing the warrant telephonically. [65, at 2.] However, Defendant walked away from that position in his reply brief. [69, at 5.]

14

for the reasons discussed in detail above.[5] The Court further concludes, again on the basis of the totality of the information presented above, that Judge Kim had a substantial basis for concluding that probable cause existed. To be sure, Defendant has raised a number of questions worthy of serious consideration. Nevertheless, after careful assessing those points in light of the full panoply of information known at the time, the Court cannot say that the application for a warrant was so lacking in probable cause that belief in the existence of probable cause was unreasonable. Based on the totality of the circumstances, the Court concludes that the agents relied on the challenged warrant in good faith and denies Defendant's motion to suppress on that basis as well.

IV. **Conclusion**

For these reasons, Defendant's motion to suppress [65] is denied. On the Court's own motion the status hearing set for May 20, 2019 at 10:00 a.m. is reset to 1:30 p.m. This is a time change only.

Dated: May 13, 2019

Robert M. Dow, Jr.
United States District Judge

---

[5] The Court recognizes that "[t]he unlawfulness of using deliberately falsified allegations to establish probable cause could not be clearer." *Rainsberger v. Benner*, 913 F.3d 640, 653 (7th Cir. 2019) (citation omitted).